Jason H. Woltman, Esq. (SBN 314122)
Jason@woltmanlaw.com
8310 Miramar Mall, Ste A
San Diego, CA  92121
Telephone: (619)800-4132

Attorney for Plaintiffs
SARA KELLEY and TERESA SMITH

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA M. KELLEY, an individual, and TERESA L. SMITH, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, JESSICA AYALA, an individual, VALERIE HILLS, an individual, MARGO FUDGE, an individual, MYRNA MURRILO, an individual, ALICIA ROGERS, an individual, WENDY CURIEL, an individual, VALESHA BULLOCK, an individual, and NICK MACCIONE, an individual. <br><br> Defendants. | Case No.:   **'19CV1404 LAB JLB** <br><br> **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, RESTITUTION, AND DAMAGES UNDER THE UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983), THE U.S. AND CALIFORNIA CONSTITUTIONS, AND CALIFORNIA CIVIL CODES, LAWS, AND STATUTES** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     This case is about retaliation for the exercise of free speech, discrimination on the basis of sexual orientation and/or sex, and due process violations regarding the removal of a foster child from the home of a same-sex couple who were in the process of adopting a teenager who had been placed with them by the County of San Diego Health

1

and Human Services Agency (the "Agency"). The Agency's actions violated plaintiffs' constitutional rights under the First Amendment, Fourth Amendment, Eighth Amendment, and the Fourteenth Amendment; and various state laws, including, but not limited to, the Bane Act, the Unruh Civil Rights Act, statutes, and related common laws that prohibit discrimination and protect against the Agency's actions for fraudulent misrepresentation, defamation, and infliction of emotional distress.

2. The Agency induces upstanding members of the community into becoming foster and resource parents by keeping its actual policies and customs a secret to the detriment of foster/resource parents, foster children, the public at large, and the legislature, all of whom are desperately trying to remedy the long-standing issues in the foster system. There is a crisis within the foster system – foster/resource parent retention is abysmal, approximately half of all foster/resource parents quit within the first year or after the first placement, a significant number of social workers quit within five years, and tens of thousands of children age out of the system each year, often without a permanent adult or familial connection – and taxpayers spend millions of dollars each year without gaining meaningful improvements in outcomes. Years ago, the Agency, in an attempt to remedy some of these issues, implemented the Quality Parenting Initiative ( "QPI") and the associated QPI Partnership Agreement, but has repeatedly failed to train and supervise its employees to allow for it to be properly and fully implemented and continues to cling to its detrimental customs and practices.

3. The Agency's violations of the constitutional and other legal rights of its foster/resource parents are systematic and pervasive within the Agency's foster system. The Agency intimidates and terrorizes volunteer foster/resource parents into ceding, to their detriment, constitutionally protected rights to the Agency. No independent outlet exists to address foster/resource parents' concerns, and any attempts to use the Agency's internal reporting system, such as the social workers, ombudsman, supervisors, program managers, and other employees are either disregarded or met with a terror-inducing level of retaliation; including threats of removal and improper removal of foster children; failing to place or allow adoption of foster children in their homes without any legitimate

reason; and making illogical, defamatory, and demonstrably false allegations and filing public complaints against them entirely without due process to dissuade foster/resource parents from speaking out against the Agency's policies and decisions.

4.     The Agency, using its practically unchecked powers, knowingly and recklessly fails to properly inform or alert anyone to the potential dangers of becoming a foster/resource parent and hides behind a veil of confidentiality unique to the foster system. The Agency remains steadfast in its efforts to discriminate, retaliate, and keep its secrets. It lacks any incentive to change on its own – rather, it grows more emboldened and empowered with each travesty, whether it is a foster/resource parent who quits or a child who moves to a new home believing he or she did something wrong – the injustices and the millions of lives adversely affected by this system cannot continue.

5.     Under Cal. Welf. & Inst. Code §§ 300 et seq., if a foster child is abandoned or cannot return home, the Agency will request a juvenile court order to terminate parental rights, and if granted, the child is freed for adoption. Preference for an adoptive placement must be given to the foster/resource parents caring for the child over all other applications once the Agency determines there are substantial emotional ties to the foster/resource parents because removal is detrimental to the child's well-being. If a timely objection is filed in response to a proposed removal of a child by the Agency from the home of a prospective adoptive parent, the juvenile dependency court is required to make best interest findings before moving a child.

6.     Plaintiffs are a same-sex married couple, both well-established professionals in the San Diego community, who want to adopt children from the foster system, and have been foster/resource parents since 2015.

7.     In March 2017, the Agency placed a foster child (hereinafter referred to as "Teenager") in Plaintiffs' home. Plaintiffs were subsequently granted educational rights and de facto parent status for Teenager. Plaintiffs became prospective adoptive parents after Teenager was freed for adoption. Teenager was an adoptive placement who lived in Plaintiffs' home until the social worker left with him in Jun. 2018 to retaliate and discriminate against Plaintiffs.

8.     In Mar. 2018, Plaintiffs appeared in court to address the delay in preparing documents required to process the adoption. Two days later, the social worker began retaliating against Plaintiffs. Three months later, the social worker informed Plaintiffs she had placed the adoption on a permanent hold. Two weeks later, the social worker took Teenager from Plaintiffs' home without proper notice or a court order.

9.     On Father's Day, Jun. 17, 2018, Teenager told Plaintiffs he wanted a mom and dad. Two hours later, the social worker entered Plaintiffs' home and demanded they "suspend" talking about "adoption" and "sexual orientation," and then demanded they find a place for Teenager to spend the night. The social worker left with Teenager to take him to his friend's home to spend the night. Teenager never returned home.

10.    The Agency then placed Teenager in respite but would not disclose his location to Plaintiffs. Hours after sending an email to the Agency requesting a meeting and Teenager's location, and asserting their rights in the child, Plaintiffs were notified by the Agency it had opened an investigation based on allegations Plaintiffs had made statements the Agency deemed "inappropriate" and placed a hold on their home. There were and are no allegations of abuse or neglect against Plaintiffs; one of the allegations is for using the word "gay" inappropriately in Plaintiffs' home.

11.    The Agency detained Teenager in respite for twenty-three days and billed all of the respite hours to Plaintiffs' account using their patient identification number without Plaintiff's knowledge or authorization and without ever knowing Teenager's location.

12.    Without notice and before a hearing or court order for removal from Plaintiffs' home, Teenager was placed in a different home with an opposite-sex couple as parents.

13.    In Aug. 2018, the Agency determined the allegations were substantiated (public) against Plaintiffs for words the Agency deemed "inappropriate," the Agency required Plaintiffs to take classes to cure their "deficiency" for using the word "gay" inappropriately. The hold on Plaintiffs' home was subsequently lifted after completing the classes. Plaintiffs remain eligible for placements, yet the Agency refuses to place any

children in their home despite approximately fifty (50) foster children currently in need of homes.

14.   In Oct. 2018, during a meeting to appeal the allegations, the Agency informed Plaintiffs that Teenager was removed from their home because of a concern that Plaintiffs were "pushing" gay on Teenager. The Agency refuses to place any other children in their home and continues to retaliate and discriminate against Plaintiffs.

15.   Plaintiffs seek declaratory and injunctive relief in addition to compensatory, statutory, and punitive damages to compensate Plaintiffs for the Agency's actions and to end the Agency's discriminatory and retaliatory practices.

## PARTIES

**Plaintiffs**

16.   Plaintiff Sara Kelley ("Plaintiff Kelley"), an individual, is a resident of the State of California and the County of San Diego.

17.   Plaintiff Teresa Smith ("Plaintiff Smith"), an individual, is a resident of the State of California and the County of San Diego. Plaintiff Smith is married to Plaintiff Kelley (collectively, "Plaintiffs") as a same-sex married couple who form a resource family.

**Defendants**

18.   Defendant, the County of San Diego Health and Human Services Agency ("Defendant" or "Agency"), is now and, at all times mentioned herein, was a local government agency and subdivision of the State of California. The Agency trains, licenses or certifies, supervises, and places foster children with foster/resource parents.

19.   Upon information and belief, at all times mentioned herein, the following Defendants were individuals employed by the Agency and acted as agents for the Agency in their respective positions:

   a.   Defendant, Jessica Ayala ("Defendant Ayala"), J.D., M.S.W., and Protective Services Worker ("PSW");

   b.   Defendant, Valerie Hills ("Defendant Hills"), M.S., Protective Services Supervisor and Ayala's direct supervisor;

c. Defendant, Margo Fudge ("Defendant Fudge"), M.S.W., Adoptions Protective Services Program Manager and Hills' direct supervisor;

d. Defendant, Myrna Murillo ("Defendant Murillo"), Agency Investigator;

e. Defendant, Alicia Rogers ("Defendant Rogers"), Agency Investigator and Defendant Murillo's direct supervisor;

f. Defendant, Wendy Curiel ("Defendant Curiel"), Protective Services Program Manager – Foster/RFA Home Licensing;

g. Defendant, Valesha Bullock ("Defendant Bullock"), Deputy Director; and

h. Defendant, Nick Maccione ("Defendant Maccione"), FACHE, Agency Director.

## JURISDICTION AND VENUE

20.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arising from the same factual circumstances, events, and transactions under 28 U.S.C. § 1367(a).

21.   Venue is proper in this Court in the Southern District of California under 28 U.S.C. § 1391 because the Defendant, the County of San Diego Health and Human Services Agency, is local government agency with its facilities located in the District, and for and all events given rise to Plaintiffs' claims occurred in the District by and through its agents and employees. The relief Plaintiffs seek is within this Court's power to grant.

## COMMON FACTUAL ALLEGATIONS

Plaintiffs allege the following common facts on information and belief.

22.   Plaintiffs were domestic partners for four years before getting legally married in California in 2013. In 2015, they started the process of becoming licensed foster/resource parents through the Agency with the intention and desire to foster and adopt any children placed in their home that were available for adoption, including

special needs children, older children, and sibling sets. Sara and Teresa each spent over 150 hours attending training and certification courses, completing interviews and questionnaires, completing background and reference checks, and completing home inspections, and providing substantial financial and personal information to the Agency to become foster/resource parents. During those initial interviews, the Agency asked Plaintiffs on several occasions if they were concerned about discrimination towards the children for having same-sex parents; they replied that they would be able to address those issues with the children if they arose. In Sep. 2015, the Agency licensed Plaintiffs as foster/resource parents; Plaintiffs were converted to certified resource parents after another extensive home study in Feb. 2018 in preparation for finalizing the adoption of Teenager and fulfilled another requirement as prospective adoptive parents.

23.    By and through the Agency's employees and written materials distributed to Plaintiffs by the Agency, and based on California laws and statutes in effect at the time, Plaintiffs believed the Agency would not discriminate against same-sex couples, which led Plaintiffs to complete the numerous and extensive requirements to become licensed as foster/adoptive parents and enter into placement agreements for four children.

24.    Plaintiffs invested considerable resources, including money, time, trust, and their emotional well-being into becoming foster parents (a nine-month process) and fostering children for a cumulative total of twenty-seven (27) months beginning in Sep. 2015. During the time Plaintiffs spent as foster/resource parents with the Agency over the years, Plaintiffs were induced to waive any and all opportunities to become foster/adoptive parents through any other entity.

25.    In Mar. 2017, Teenager was placed with Plaintiffs as an adoptive placement and they were granted educational rights for Teenager. In May 2017, Plaintiffs were granted de facto parent status by the juvenile dependency court.

26.    In Sep. 2017, shortly after a new adoption social worker, Defendant Ayala, was assigned to the case, Teenager became available for adoption and the court designated Plaintiffs as a proper permanent placement for Teenager. From Sep. 2017 through March 5, 2018, Plaintiffs were regularly assured by Defendant Ayala that she

was preparing the documents for the adoption of Teenager by Plaintiffs, reaffirming previous statements by the Agency that Plaintiffs were the designated permanent placement for Teenager.

27.     On Mar. 5, 2018, Plaintiff Kelley appeared in court and expressed concern to the judge about the Agency's delays in the timeline for the adoption; the judge assured Plaintiff Kelley that it takes time to prepare paperwork and there was no reason for concern. Until that day, there had been no issues whatsoever between Plaintiffs and Defendant Ayala. Defendant Ayala subsequently admitted she had been proceeding with the adoption of Teenager by Plaintiffs as of Mar. 5, 2018.

28.     On Mar. 7, 2018, two days after Plaintiff Kelley appeared and spoke in court to address her concerns, Defendant Ayala began retaliating against Plaintiffs and began taking affirmative steps to disrupt the family and thwart the adoption. On Mar. 7, Defendant Ayala emailed Plaintiff Kelley with a fictional prerequisite to finalize the adoption of Teenager that would delay the adoption by at least six months; Plaintiffs did not know the prerequisite was fictional at the time, but it was subsequently discovered by Plaintiffs. Despite a previously good relationship between Plaintiff Kelley and Defendant Ayala, Defendant Ayala escalated her retaliation against Plaintiffs, which was almost exclusively directed towards Plaintiff Kelley, and repeatedly engaged in shame-based criticism of Plaintiff Kelley and reprimanding Plaintiff Kelley for speaking in court.

29.     On Mar. 23, 2018, Defendant Ayala called Plaintiff Kelley to ridicule, chastise, threaten, and criticize Plaintiff Kelley. As the phone call was ending, Defendant Ayala stated: You mentioned you didn't like the timeline to the Judge and if the Judges think we can speed things up, then they will send us a message. After the call ended, Plaintiff Kelley began sobbing and was struck with an overwhelming feeling of terror and disbelief. Plaintiff Kelley had spoken in court and had broken the cardinal rule: Never question the Agency – Keep your head down and your mouth shut.

30.     On Mar. 28, 2018, Defendant Ayala met with Plaintiffs in their home to discuss the adoption timeline. Defendant Ayala set a goal of finalizing the adoption by

the end of June and Plaintiffs agreed to give her time to complete the paperwork. Defendant Ayala did not mention any concerns or any reasons the adoption would be delayed any further.

31.    From Mar. 29 through May 23, 2018, almost two months, Defendant Ayala largely ignored Plaintiffs and other professional service providers. Defendant Ayala did not do any home visits, but instead, unbeknownst to Plaintiffs, Defendant Ayala began meeting with Teenager at school. At some point, still unknown to Plaintiffs, Defendant Ayala unilaterally decided to place the adoption "on hold." On May 24, 2018, Plaintiff Smith called Defendant Ayala, who told Plaintiff Smith for the first time about the adoption "hold," but refused to discuss it further. Defendant Ayala made a point to state it had nothing to do with Plaintiffs and Teenager said only good things about them.

32.    On Jun. 5, 2018, there was a Child and Family Team ("CFT") meeting in the family home, which was required to close out a service provider. Plaintiffs, Teenager, Defendant Ayala, and two service providers attended. During the two-hour meeting, Defendant Ayala created antithetical goals and flipped between ignoring team members and being hostile to each person on the team. Despite Plaintiffs' pleas to help them understand why the adoption had been placed on hold, Defendant Ayala, suddenly, decided it had become an indefinite hold. Plaintiff Kelley took a short break, and when she returned, Defendant Ayala reprimanded her for leaving and told Plaintiff Kelley she was reminded of what she did in court. Plaintiff Kelley calmly stated that she did not know what was expected of Plaintiffs and asked for an update about an unanswered request. This caused Defendant Ayala to become irate and began shouting at Plaintiff Kelley. Plaintiff Kelley felt threatened and scared of Defendant Ayala, but feared reporting Defendant Ayala to the Agency based on a belief it would induce Defendant Ayala to increase her threats and retaliation against Plaintiffs and it would place their family in danger.

33.    On Jun. 6, 2018, the day after the CFT meeting in Plaintiff's home, an allegation for an "inappropriate" statement was purportedly received by the Agency. Plaintiffs allege that Defendant Ayala, for the sole purpose of further retaliation against

Plaintiff Kelley, and in violation of Welfare and Institutions Code Sections 832, et seq., and Sections 16501, et seq., regarding confidentiality of statements made during CFT meetings, filed an allegation against Plaintiff Kelley to use the Agency's investigatory process to harass Plaintiffs and Teenager in an effort to destabilize the family. The allegation was made with malice and/or reckless disregard for the truth and was definitively not about safety concerns, but rather for the purpose of retaliating against Plaintiffs for exercising their civil rights to speak in their home and challenge actions and decisions by the Agency. Plaintiffs did not know about this allegation until Jun. 20.

34.    On Jun. 17, 2018, twelve days after the CFT, the tension was palpable in the home. It was now twenty-four days living in an indefinite state of family planning avoidance because Plaintiffs still did not know why the adoption was on hold. It was Father's Day – Teenager was grumpy. Earlier in the morning, Teenager begrudgingly complied with a request by Plaintiff Smith before leaving to watch the World Cup games at a friend's house. Plaintiff Smith gave Teenager permission to go to friend's house and instructed the teenager to return right after the games ended. Teenager returned home two hours late and did not reply when Plaintiff Kelley asked him where he had been. Sensing Teenager was in a bad mood, and not knowing about the what occurred earlier with Plaintiff Smith, Plaintiff Kelley asked him to share what was bothering him. Teenager told Plaintiffs that he wanted a mom and dad. Shocked, surprised, and believing this was likely the reason the adoption was on hold, Plaintiffs mentioned that he may have a conversation like this someday with his kids and the discussion ended shortly thereafter. Plaintiffs left for the grocery store to give Teenager some space.

35.    Plaintiffs returned home from the store to discover Teenager and Defendant Ayala meeting at the park across the street from the family home. Defendant Ayala had not tried to reach Plaintiffs when she arrived at their home.  Defendant Ayala entered the Plaintiffs' home and asked Plaintiffs if they were giving notice on Teenager; they replied, "No." Defendant Ayala asked what happened and Plaintiffs explained the day's events and the conversation with Teenager. Defendant Ayala stepped outside to take a call from Defendant Fudge; she returned and told Plaintiffs they needed to "suspend"

talking about "adoption" and "sexual orientation." Plaintiff Kelley looked at her quizzically because she believed Defendant Ayala knew her demands were unconstitutional. After no response to her request, Defendant Ayala told Plaintiffs to find a place for Teenager to stay overnight. Plaintiffs reluctantly agreed and called his friend's mom. Defendant Ayala left shortly thereafter with Teenager and teenager never returned home.

36.   On Jun. 18, 2018, Plaintiff Smith picked up Teenager from his friend's home and took him to school, as Defendant Ayala had directed her to do the day before. Defendant Ayala called Plaintiff Kelley around noon and said Teenager wanted to stay at his friend's house through the end of the week. Defendant Ayala called back a few minutes later and told Plaintiff Kelley that Teenager was going to respite until Friday. That night, Defendant Ayala came to Plaintiffs' home to pick up some of Teenager's belongings, affirmed he was still placed with Plaintiffs, but refused to tell them where Teenager was located or how to contact him.

37.   On Jun. 19, 2018, Plaintiff Kelley sent an email to the Agency and requested Teenager's location contact information to verify he was safe, a meeting with the Agency to discuss the situation, and expressed Plaintiffs' concerns about how they were very uncomfortable with the situation and asserted their rights as Teenager's prospective adoptive parents, de facto parents, and educational rights holders. Defendant Ayala's supervisor, Defendant Hills, replied by email, but ignored Plaintiff Kelley's legitimate concerns about Teenager being in an undisclosed respite location. Hours later, Plaintiff Kelley received a call from investigator Defendant Murillo, requesting a meeting to discuss allegations filed against Plaintiffs – the situation was escalating and Plaintiffs were terrified. That night, Defendant Ayala came to Plaintiffs' home, again, to take more of Teenager's belongings and pretended not to know any information about the situation, although she stated Teenager was still placed in Plaintiffs' home and there had not been a hearing or court order to remove Teenager.

38.   On Jun. 20, 2018, Plaintiffs met with Defendant Murillo, who was investigating allegations of "inappropriate" comments, and assured Plaintiffs that these

11

were not allegations of abuse or neglect, merely child's rights allegations, which did not and do not necessitate removal. Defendant Murillo told Plaintiffs there was still a child placed in their home and was unconcerned by Plaintiffs' reports they had not seen Teenager for three days. During Defendant Murillo's interview with Plaintiff Kelley, Defendant Murillo repeatedly interrupted Plaintiff Kelley and implied she was a liar and asked derogatory questions and made disrespectful comments about Plaintiff Kelley's status as a gay person. Plaintiffs allege that someone at the Agency (likely Defendant Ayala), for the purpose of further retaliation against Plaintiffs, filed the second allegation to use the Agency's investigatory process to harass Plaintiffs and coerce Plaintiffs into waiving their rights to Teenager.

39.   Later that day, on Jun. 20, 2018, Defendant Ayala and Defendant Hills served Plaintiffs at their home with a copy of an unfiled "Notice of Intent to Remove" ("Notice") Teenager. There was no indication that Teenager was no longer living with Plaintiffs and the all of statements (not allegations of abuse or neglect) about Plaintiffs in the Notice were made with malice and/or with reckless disregard for the truth; one of the statements in the Notice is physically impossible. Defendant Ayala's statements were essentially a character assassination of Plaintiffs, replete with innuendo and hyperbole, and lacked any evidence of the assertions made. Plaintiffs allege Defendant Ayala knew at the time she signed the Notice the statements were false; they directly contradicted evidence she had in her possession, evidence unknown to Plaintiffs at the time, and she did not provide the exculpatory evidence to Plaintiffs, nor did anyone at the Agency make any attempts to verify the accuracy of the statements. The notice sent a clear message to Plaintiffs:  Stand down or we will ruin your lives.

40.   On Jun. 22, 2018, Plaintiff Kelley sent an email to the Agency detailing the events of the week and requested to pick up Teenager because there had not been a hearing or no court order for removal, and there were no allegations of neglect or abuse necessitating removal of Teenager. Defendant Ayala replied she had determined it was not appropriate to return Teenager to Plaintiffs. Plaintiff Smith sent an email to Defendant Maccione requesting a review of the situation, but he never replied. After

repeated requests for the final date of placement, Defendant Fudge later informed Plaintiffs in Oct. 2018 that the placement had ended on Jun. 22 (before the time to file an objection expired). Plaintiffs were saddened, shocked, confused, horrified, terrified, and humiliated; they were powerless and unable to assert any rights they supposedly had as de facto parents, educational rights holders, or prospective adoptive parents. Plaintiffs' believed the Agency had improperly removed a child from Plaintiffs' home in retaliation for questioning Defendant Ayala's progress on the adoption in court on Mar. 5, 2018. Acting with deliberate indifference towards Plaintiffs, no one at the Agency would meet or discuss the situation with Plaintiffs, no one would tell them Teenager's location or allow them to verify he was safe, and he had stopped attending summer school even though Plaintiffs had educational rights. Each time Plaintiffs tried to engage with the Agency, the retaliation increased. Plaintiffs were living in a constant state of fear, not only for themselves, but for the safety of Teenager who had essentially vanished.

41.   Plaintiff Kelley later learned the Agency had a long-standing policy that a child over the age of twelve can withdraw their consent to a placement at any time for any reason (affirmed by Defendant Fudge in Oct. 2018). Plaintiffs believed that challenging the Agency's removal request would likely cause an increase in retaliation, and if the Agency succeeded, Plaintiffs could potentially never be able to work again in their chosen professional fields. Plaintiffs had no prior reason to believe the Agency would engage in an unconstitutional violation of Plaintiffs' rights and allow de facto discrimination against them based on their status as a same-sex couple and/or based on their gender. Plaintiffs believed at the time that Teenager's reason for not consenting to an otherwise appropriate adoption (and withdrawing consent to the placement) was because he wanted a mom and dad (a woman and man) as parents, but now believe he was also intimidated by the Agency into relinquishing his rights to return home to Plaintiffs. Plaintiffs, for the first time as a same-sex married couple, felt the overwhelming weight of being second-class citizens, and tried to accept the irreparable harm caused by the Agency through by the abrupt removal of Teenager. Plaintiffs were devastated but believed challenging an Agency willing to inflict absolutely terrifying

levels of retaliation – all because Plaintiff Kelley spoke in court and questioned Defendant Ayala – would be futile and dangerous.

42.   On Jun. 27, 2018, under exceptional duress, Plaintiffs did not object to the removal itself, but filed 44-pages of documentation and evidence with an objection and denial to each and every statement by Defendant Ayala in the Agency's Notice to the juvenile dependency court to show the statements Defendant Ayala made were with malice and/or reckless disregard for the truth. Plaintiffs hoped the court would remedy the situation and believed they could at least prevent losing everything they spent nearly twenty-five years working to accomplish.

43.   On Jul. 18, 2018, a hearing for the objection to the removal occurred. Plaintiffs were not provided advance notice of the hearing and no best-interest determinations were made by the juvenile court at the hearing. Plaintiff Kelley received a call from Defendant Ayala after the time the hearing was set to begin and the court called Plaintiff Kelley. Plaintiffs had the right to a noticed hearing before the removal, and if Plaintiffs had known at the time the information they later discovered – Teenager spent 23 days in respite (over 300 hours were billed to Plaintiffs' Maxim Healthcare Services patient account using their names and patient identification number) at a cost of over $8,000 to taxpayers, without Plaintiffs knowledge, authorization, or approval – Plaintiffs might have acted differently. To date, the Agency refuses to provide Plaintiffs with a "Notice of Action" stating the final date of placement.

44.   Plaintiffs allege the Agency used the investigation and complaint process and the juvenile dependency court with malice and/or reckless disregard for the truth to justify its actions and impress upon Plaintiffs there are repercussions for speaking out against the Agency. To further its objectives of discrimination and retaliation against Plaintiffs, the allegations for words the Agency deemed inappropriate, presumably submitted to the Agency by Defendant Ayala and investigated by the Agency while acting with deliberate indifference to Plaintiffs, have been substantiated for the public to view, jeopardizing Plaintiffs' life, liberty, and property interests indefinitely and in perpetuity.

45.    After the hearing on Jul. 18, 2018, Plaintiffs remained a party to Teenager's case with de facto parent status and retained educational rights holders. Based on false testimony and statements made with malice and/or with reckless disregard for the truth submitted to the juvenile dependency court by Defendant Ayala and employees of the Agency, Plaintiffs' educational rights were terminated without proper notice or a hearing, and acting with deliberate indifference towards Plaintiffs and violating Plaintiffs' due process rights.

46.    In Sep. 2018, Plaintiff Kelley appeared at a trial to attempt to restore educational rights and keep de facto parent status. In the moments before the trial began, Teenager's attorney took the opportunity to impress upon Plaintiff Kelley the consequences for speaking in court by using the phrase "character assassination" repeatedly to Plaintiff Kelley, which she believes was an attempt to intimidate her. Plaintiff Kelley had not forgotten that the last time she appeared in that courtroom and spoke (on Mar. 5), it set forth a wave of seemingly never-ending and increasingly more frightening false-accusations and life-altering repercussions. The Agency's attorney refused to provide Plaintiff Kelley with Defendant Ayala's filed report for the trial and laughed at Plaintiff Kelley when she requested it before trial, making it nearly impossible for Plaintiffs to have a fair trial in violation of Plaintiffs' due process rights. Nonetheless, Plaintiff Kelley believed she had to proceed with the trial and she could prove Defendant Ayala had previously committed perjury (even without knowing the contents of the report), restore Plaintiffs' reputations before the juvenile dependency court, and retain rights to Teenager to ensure he was not left alone bouncing around the foster system from home to home. Because of statements by Defendant Ayala in her report, which was yet another character assassination of Plaintiff Kelley unknown to Plaintiffs at the time of trial but later discovered, made with deliberate indifference, malice, and/or with reckless disregard for the truth, Plaintiffs did not prevail at the trial and de facto parent status was terminated by the juvenile dependency court. Plaintiffs had been permanently alienated from Teenager, although Plaintiffs did not fully understand the extent of Defendant Ayala's retaliatory actions or the discriminatory

animus held by the Agency and others involved in the situation and events that transpired beginning on Mar. 5, 2018.

47.    On Oct. 22, 2018, Plaintiffs met with Defendant Curiel and Defendant Fudge to discuss the allegations and complaints as part of the appeal process. Plaintiffs still did not know which, if any, law or written directive they had violated, why Teenager had been removed, and why the Agency could not understand that a gay person using the word "gay" is not a deficiency. Defendant Curiel and Defendant Fudge again stated that the allegations, despite being substantiated against Plaintiffs, were not abuse or neglect, there had been no allegations of abuse or neglect filed against Plaintiffs at any time, nor had there been any suspicions of abuse or neglect at any time for any of the children placed in Plaintiffs' home. Plaintiff Kelley desperately tried to explain that the Agency was exceeding the scope of the law and the intentions of the written directives to the long-term detriment of foster/resource parents' reputations and livelihoods by turning constitutionally-protected speech into public complaints intended to be reserved exclusively for substantiated complaints of abuse or neglect and/or serious deficiencies that might jeopardize the safety of the children. Plaintiff Kelley explained, to no avail, the Agency's long-standing policy and custom of using investigations and allegations without a reasonable basis to retaliate against foster/resource parents lacked due process and violated several constitutional rights, including the right to privacy and free speech.

48.    Plaintiff Kelley also tried to explain that the Agency's demand and requirement for her to take classes to cure her "deficiency" (the term used on the complaints) had a devastating impact on Plaintiff Kelley's emotional well-being and her rights as a gay person, and that it was unconstitutional for the Agency to demand that as a remedy based on her sexual orientation and as a consequence for using the word "gay" in her home. Plaintiff Smith tried to explain to Defendant Fudge that forbidding discussion about "sexual orientation" in the home would not be the correct way to address the situation, and Defendant Fudge retorted the concern was that Plaintiffs had

16

been "pushing gay" on Teenager. With that, finally, Plaintiffs knew how "gay" had become their deficiency.

49.    Plaintiffs later realized why the Agency and all the Agency's employees involved in the situation backed Defendant Ayala's actions and statements and justified their actions for removing Teenager that day from the home, why the Agency decided it was not appropriate to return Teenager to Plaintiffs, and why the Agency still refuses to place any children in their home. Even if no one else knew about Defendant Ayala's retaliation – Defendant Fudge, the program manager for adoptions at the Agency, and the other Defendants employed by the Agency, believed Plaintiffs were pushing their gay agenda on a foster child and the antidote to a problem they envisioned was to place Teenager with a mom and a dad as parents and alienate him from Plaintiffs.

50.    The Defendants' actions illustrate the Agency's lack of vital training and supervision of its employees. The Agency has never provided Plaintiffs with a legally-defensible rationale justifying taking Teenager, detaining him in respite, placing him in a new home before a hearing or a court order, and alienating him from Plaintiffs.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Equal Protection

### (Fourteenth Amendment; Cal. Const. art I, § 7; 42 U.S.C. § 1983)

51.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.    Defendants actions toward Plaintiffs constitute actions under color of law.

53.    Defendants discriminated against Plaintiffs and denied them fair and equal treatment on the basis of Plaintiffs' sexual orientation and/or gender.

54.    Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution and California Constitution was violated by this discrimination.

//

//

55.     Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their constitutional rights, as described herein.

56.     Plaintiffs have a cause of action for violations of their constitutional right to equal protection under the Civil Rights Act, 42 U.S.C. § 1983.

57.     Defendants conduct as stated herein violate provisions of Article I, § 7 of the California Constitution.

58.     As a result of the Defendants' actions under color of law, Plaintiffs have suffered and will continue to suffer emotional distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Plaintiffs to injunctive and declaratory relief, compensatory damages, restitution, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Substantive Due Process – Void for Vagueness

### (Fourteenth Amendment; Cal. Const. art I, § 7; 42 U.S.C. § 1983)

59.     Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.     The Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

61.     In order to satisfy the Due Process Clause, a law must be sufficiently definite to provide adequate notice of the conduct proscribed and provide sufficient guidelines so that arbitrary and discriminatory enforcement does not occur.

62.     Defendants interpretation and enforcement of the Written Directives, and the phrase "Written Directives or any applicable laws," on the allegations to describe what is considered a violation of the child's personal rights does not satisfy the requirements of the Due Process Clause.

63.     Defendants failed to cite any specific law or ordinance on any of the allegations against Plaintiffs. Plaintiffs repeatedly inquired about the rule violated, they

were told the allegations were general personal rights violations. There is no published rule, statute, or law that states that "inappropriate" comments or remarks or that the word "gay" or any of the other allegations as stated in the complaints is disallowed.

64.     The Written Directives and other applicable laws as interpreted by Defendants, and as enforced by Defendants fail to provide adequate notice and sufficient guidance, which would allow an individual to ascertain beyond mere speculation as to how one knows when they are engaged in any prohibited activity that violates the child's personal rights or what terms or words used in any context are "inappropriate," which could rise to the level of an investigation and/or a substantiated or inconclusive public complaint, or an investigation into the conduct alleged.

65.     Located on the QPI website are several documents regarding investigations of foster and resource parents, and there have been multiple All County Letters issued to remind the Agency about how to conduct investigations. In CCL - Information Release 2016-01, dated Jan. 19, 2016, issued by the State of California Health and Human Services Agency, titled, "Communication with Foster Parents About Investigations Regarding Children in Out-of-Home Placements," recognizes that "investigations put foster parents under suspicion and are stressful," and directs the Agency to "screen out complaints that are 'willfully intended to harass a licensee'," and that it should not initiate investigations into allegations "without a reasonable basis," because "[f]rivolous licensing complaints and investigations lead to decreased retention of quality parents," and requires investigations to be conducted with "courtesy and respect" towards foster/resource parents.

66.     Defendants repeatedly and knowingly failed (and continues to fail) to comply with the directives and laws regarding investigations into allegations, and repeatedly violated (and continues to violate) the due process rights of Plaintiffs and other foster/resource parents during investigations in the County of San Diego, indicating the Agency's actions are based on its ongoing policies and customs, even though it has known for years that its policies and customs are detrimental to its own objectives of retaining homes for foster and adoptive placements.

67.   According to information presented by the Agency at a foster/resource training in Jan. 2019, all allegations (69% in one year were the elusive "personal rights" catchall) are allegedly first reviewed by Defendant Rogers and she is the only person at the Agency who determines whether to assign an investigator. Defendant Rogers allegedly reviewed and signed the findings before the investigator, Defendant Murillo, presented them to Plaintiffs. Plaintiffs timely appealed and the first level of review went back to Defendant Rogers, the direct supervisor for Defendant Murillo. For Plaintiffs to prevail at the first appeal, it would require Defendant Rogers, the direct supervisor of the investigator, to disagree with herself and all of her previous decisions.

68.   Plaintiffs timely appealed the complaints to Defendant Curiel, the direct supervisor for Defendant Rogers, who informed Plaintiffs that the complaints had already gone through multiple reviews at the Agency by the time it got to her, which meant the previous reviews were further evidence to support her decision. Defendant Curiel upheld the findings of substantiated for the allegations without providing a specific law or Written Directive allegedly violated by Plaintiffs.

69.   Plaintiffs timely appealed to Defendant Bullock, the direct supervisor of Defendant Curiel, who also upheld the allegations findings. Plaintiffs again requested a specific law or Written Directive allegedly violated for each and every deficiency to form the basis of the allegations and an explanation of why the alleged "inappropriate" remarks are a violation, and a thorough explanation of why "gay" is a deficiency. Defendants have never provided an explanation of what, exactly, was alleged or what law or written directive was violated. Defendant Bullock informed Plaintiffs that her review was the final review and never provided Plaintiffs with the requested information.

70.   There is no appeal outside the Agency for any allegations or complaints that are not abuse or neglect, and no part of the appeal or investigative process escapes a single chain of command within the Agency.

71.   Defendants repeatedly assured Plaintiffs both verbally and in writing they would be provided with due process rights to a fair and impartial investigation and the

right to appeal without retaliation. The allegations, complaints, investigations, and the appeals process is so elusive that it is next to impossible for Plaintiffs to be afforded with any due process rights when they are not provided with a law or written directive allegedly violated, persons to whom to appeal, deadlines to appeal, or timely decisions. The Agency's lack of oversite and willful ignorance of what is occurring illustrates the Agency's lack of vital training and supervision of its employees, which violates Plaintiffs' due process rights.

72.   The Written Directives invites selective enforcement against resource parents, and potentially resource parents in the same home for the same words and/or conduct.

73.   Plaintiffs have attempted to comply with the Written Directives but have nonetheless had public complaints issued against them under its vague and overbroad reach by punishing Resource Families for protected speech based on content and dictating and determining which speech is deemed "appropriate" on an ad hoc basis.

74.   As a result of the Defendants' actions, Plaintiffs have been and continue to be forced to endure punitive treatment for protected speech and have been and continue to be deprived of or threatened with the deprivation of the right to a family, and potentially the right to life, liberty, and property interests insofar that the Complaints are public and all appeals have been exhausted. The allegations and complaints should be struck from Plaintiffs public and private records so they will not remain a part of the public record tarnishing Plaintiffs' reputation and threatening their livelihoods in perpetuity.

75.   Defendants conduct as stated herein violates provisions of Article I, § 7 of the California Constitution.

76.   Defendants actions toward Plaintiffs constitute actions under color of law.

77.   Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their constitutional rights, as described herein.

//

78.  Plaintiffs' right to due process under the Fourteenth Amendment to the United States Constitution and California Constitution was violated by Defendants' actions.

79.  The "Written Directives and any applicable laws," should therefore be declared unconstitutionally vague both on its face and as applied against Plaintiffs and in violation of substantive due process protections under the Fourteenth Amendment to the United States Constitution and California Constitution.

80.  Plaintiffs have a cause of action for violations of their constitutional rights under the Civil Rights Act, 42 U.S.C. § 1983.

81.  As a result of the Defendants' actions under color of law, Plaintiffs have suffered and will continue to suffer emotional distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Plaintiffs to injunctive and declaratory relief, compensatory damages, restitution, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### Retaliation (42 U.S.C. § 1983)

82.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.  Defendants retaliated against Plaintiffs for their exercising constitutional right to speak and engage in protected activities as private citizens at all times mentioned herein.

84.  Plaintiff Kelley's speech in court on Mar. 5, 2018, and Plaintiffs' subsequent protected speech, as described in all instances mentioned herein, was a substantial motivating reason for Defendants' to engage in the retaliatory actions against Plaintiffs.

85.  Defendants engaged in retaliatory conduct against Plaintiffs as mentioned herein, including, but not limited to, belittling and humiliating the Plaintiffs, requiring Plaintiffs to take unnecessary steps to complete the adoption, placing the adoption on hold, removing the child from the home without notice or court order, filing allegations against Plaintiffs, submitting false statements to the juvenile dependency court and

others about Plaintiffs, terminating the placement of Teenager, preventing contact with Teenager, terminating Plaintiffs educational rights and de facto parent status, investigating and substantiating allegations against Plaintiffs, demanding Plaintiffs refrain from speaking about sexual orientation, adoption, and other topics in Plaintiffs' home, demanding Plaintiffs engage or refrain from protected activities and conduct, failing to place children in Plaintiffs' home, all of which were and are violation of Plaintiffs rights to engage in protected activities and in retaliation for protected speech.

86.    Defendants acts were motivated, at least in part, by Plaintiffs protected activities and would likely deter a person of ordinary firmness from engaging in that protected activity and did deter Plaintiffs from engaging in protected activities.

87.    Defendants actions toward Plaintiffs constitute actions under color of law.

88.    Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their constitutional rights, as described herein.

89.    Plaintiffs have a cause of action for violations of their constitutional rights under the Civil Rights Act, 42 U.S.C. § 1983.

90.    As a result of the Defendants' actions under color of law, Plaintiffs have suffered and will continue to suffer emotional distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Plaintiffs to injunctive and declaratory relief, compensatory damages, restitution, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Use of Fabricated Evidence and Judicial Deception (42 U.S.C. § 1983)

91.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.    Defendants submitted statements about Plaintiffs knowing the statements were false, malicious, and/or made with reckless disregard for the truth to the juvenile dependency court and others, as described herein.

//

93.    Plaintiffs have a right to be free from judicial deception and statements made by Defendants with deliberate indifference, and/or statements made that are false, malicious, and/or with reckless disregard for the truth to the juvenile dependency court.

94.    Defendants investigated and substantiated complaints against Plaintiffs based on statements that were false, malicious, and/or made with reckless disregard for the truth against Plaintiffs, as described herein.

95.    Defendants actions toward Plaintiffs constitute actions under color of law.

96.    Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their constitutional rights, as described herein.

97.    Because of Defendants' conduct, Plaintiffs' procedural due process rights were violated by Defendants' actions and Plaintiffs' were deprived, as described herein.

98.    Plaintiffs have a cause of action for violations of their constitutional rights under the Civil Rights Act, 42 U.S.C. § 1983.

99.    As a result of the Defendants' actions under color of law, Plaintiffs have suffered and will continue to suffer emotional distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Plaintiffs to injunctive and declaratory relief, compensatory damages, restitution, and attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Unlawful Removal of a Child (42 U.S.C. § 1983)

100.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.  Defendants removed Teenager from Plaintiffs' home without a legal justification or basis, without a hearing, without a warrant, and/or court order, while purporting to perform their duties in their official capacity and on behalf of the Agency, as described herein.

//

//

24

102.  Removal of the Teenager from Plaintiffs' home, terminating their education rights, and terminating de facto parent status, and placement with another family violated Plaintiffs' rights.

103.  Because Plaintiffs were prospective adoptive parents, Teenager should not have been removed except for abuse or neglect, and there was no abuse or neglect.

104.  Removal of the Teenager from Plaintiffs' home violated their rights because Defendants did not provide notice of their intent to remove the child and did not have a court order before removing him and failed to provide proper notice of the Court proceedings to terminate the placement, all of which occurred while Defendants purported to perform their duties in their official capacity on behalf of the Agency.

105.  Removal of Teenager from Plaintiffs' home also violated the Agency's own rules, guidelines, and state law because removal is only to be done in cases of abuse or neglect.

106.  Defendants actions toward Plaintiffs constitute actions under color of law.

107.  Because of Defendants' conduct, Plaintiffs' procedural due process rights were violated by Defendants' actions and Plaintiffs' were deprived, as described herein.

108.  Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their constitutional rights, as described herein.

109.  Plaintiffs have a cause of action for violations of their constitutional rights under the Civil Rights Act, 42 U.S.C. § 1983.

110.  As a result of the Defendants' actions under color of law, Plaintiffs have suffered and will continue to suffer emotional distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Plaintiffs to injunctive and declaratory relief, compensatory damages, restitution, and attorneys' fees and costs.

//

//

//

# SIXTH CAUSE OF ACTION

## Government Liability (42 U.S.C. § 1983)

111.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.  Plaintiffs were deprived of their constitutional and civil rights as a result of official policies and/or customs of the Agency and these customs are widespread and well-settled practices of the Agency, as described herein.

113.  The Quality Parenting Initiative ("QPI") in CA was launched to improve outcomes in the foster system, recognizing the long history of complaints by foster/resource parents about how they were treated by the system. QPI California has several goals stated on its website, such as recruiting and retaining excellent foster and resource parents and providing additional support to those parents by giving them a voice to ensure success.

114.  Upon placement of Teenager, Plaintiffs and the Agency signed a "County of San Diego QPI Partnership Agreement" ("QPI Agreement"). Plaintiffs attempted to uphold all of the conditions of the agreement, but were repeatedly thwarted by the Agency, and at times, even attempting to uphold the terms of the agreement was often imputed harshly against them and used to justify the Agency's punitive actions against Plaintiffs.

115.  The Agency repeatedly and knowingly failed (and continues to fail) to comply with the terms and conditions of the QPI Agreement entered into by the Plaintiffs and the Agency, indicating the Agency's actions are based on its ongoing policies and customs, even though it has known for years that its policies and customs are detrimental to its own objectives and Plaintiffs and other foster and resource parents throughout the County of San Diego.

116.  Plaintiffs were deprived of their rights as a result of the Agency's failure to train and supervise its employees and agents and knew its training and supervision was inadequate because of a pattern of similar violations in the past. Defendants knew that

26

the inadequate training and supervision of its employees and agents were likely to result in the deprivation of Plaintiffs' civil rights, as described herein.

117.  Defendants have a custom and practice of removing children without proper notice and without due process and/or its written policies and procedures, and sometimes based only on a child's statements that the child no longer wants to live in a particular home, even if it is based on a discriminatory reasons.

118.  Defendants violated Plaintiffs rights by removing Teenager without proper notice and without due process and/or based on discriminatory policies because Plaintiffs were a same-sex couple and/or a particular gender.

119.  Defendants also have a custom and practice of failing to provide foster/resource parents with a fair and impartial investigation of allegations that comport with due process and other applicable legal and constitutional rights.

120.  Defendants and its agents and employees violated Plaintiffs' rights based on these official policies and customs and a failure to train its employees.

121.  Defendants actions toward Plaintiffs constitute actions under color of law.

122.  Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their constitutional rights, as described herein.

123.  Plaintiffs have a cause of action for violations of their constitutional rights under the Civil Rights Act, 42 U.S.C. § 1983.

124.  As a result of the Defendants' actions under color of law, Plaintiffs have suffered and will continue to suffer emotional distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Plaintiffs to injunctive and declaratory relief, compensatory damages, restitution, and attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION

### Violation of Unruh Civil Rights Act (California Civil Code §§ 51, 52)

125.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.  California Civil Code §§ 51, 52, also known as the "Unruh Civil Rights Act," provides a cause of action to individuals who have been denied full and equal privileges and services and the exercise or enjoyment of rights secured by the United States and/or California Constitutions and other laws because of their sex, marital status, and sexual orientation.

127.  Defendants denied, aided or incited a denial of, discriminated, and/or made a distinction that denied full and equal advantages, privileges, and services to Plaintiffs.

128.  A substantial motivating reason for Defendants' conduct was its perception of and/or status of Plaintiffs' sex, marital status, and sexual orientation.

129.  There was and is no lawful justification for Defendants to discriminate against Plaintiffs as described herein and/or to interfere with Plaintiffs' exercise of their rights. Defendant's actions were and are taken willfully and with malice and oppression in order to deter and/or prevent Plaintiffs from exercising their protected constitutional and statutory rights based on Defendants' perception of and/or status of Plaintiffs' sex, marital status, and sexual orientation.

130.  Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their rights, as described herein.

131.  Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights. Defendants' unlawful actions and the resulting injuries entitle Plaintiffs to compensatory damages, including damages for emotional distress. Plaintiffs are also entitled to injunctive relief, restitution, statutory damages, attorneys' fees and costs, and other appropriate equitable relief to protect the peaceful exercise and enjoyment of Plaintiffs' rights.

**EIGHTH CAUSE OF ACTION**

**Violation of Bane Act (California Civil Code § 52.1 "Bane Act")**

132.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

133.  California Civil Code § 52.1, also known as the "Bane Act," provides a cause of action to individuals whose exercise or enjoyment of rights secured by the

28

United States and/or California Constitutions and other laws has been interfered with, or attempted to be interfered with, by another's threat, intimidation, or coercion.

134.  By their conduct and actions as set forth herein, Defendants have interfered with, attempted to interfere with, and continues to interfere with, by threat, intimidation, and/or coercion, Plaintiffs' exercise of their civil rights based on the sexual orientation of Plaintiffs and/or Plaintiffs status as a same-sex couple, and punishments and the threat thereof, have criminalized conduct that is the involuntary result of Plaintiffs' status and in violation of Plaintiffs' rights.

135.  By their conduct and actions as set forth herein, Defendants committed acts of violence and retaliated against Plaintiffs and caused Plaintiffs to reasonably believe that if they asserted or exercised any of their rights, including, but not limited to, ask any questions about any decision or demand made by the Agency, speak about any topic the Agency deemed inappropriate, speak about "sexual orientation" or "adoption," assert educational rights, assert rights as de facto parents, assert rights as prospective adoptive parents, leave any room without permission from the Agency, appear or speak in court to exercise any rights having to do with an Agency action or decision, fail to provide money and property as demanded by the Agency on any occasion that it was demanded, fail to let Defendants enter or search Plaintiffs' home on any occasion that it was demanded, or make any statements in a private or public forum to any person about the Agency or its actions that Defendants would commit violence and retaliate against them and that Defendants had the ability to carry out the threats.

136.  There was and is no lawful justification for Defendants to threaten, intimidate, or coerce the Plaintiffs, or to attempt to use threats, intimidation, or coercion as described herein to interfere with Plaintiffs' exercise of their rights. Defendant's actions were and are taken willfully and with malice and oppression in order to deter and/or prevent Plaintiffs from exercising their protected constitutional and statutory rights.

137.  Because of Defendants' conduct, Plaintiffs' rights were violated by Defendants' actions and Plaintiffs' were deprived of their rights, as described herein.

138.  Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Plaintiffs to compensatory damages, including damages for emotional distress. Plaintiffs are also entitled to injunctive relief, restitution, statutory damages, attorneys' fees and costs, and other appropriate equitable relief to protect the peaceful exercise and enjoyment of Plaintiffs' rights.

## NINTH CAUSE OF ACTION
## Misrepresentation

139.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

140.  Defendants' statements describing their policies regarding placement and/or adoption with foster/adoptive parents and removal of children from foster/adoptive parents were false and misleading.

141.  Defendants' false representations were intentional, made with reckless disregard as to whether they were true or false, there was no reasonable basis for making these representations to Plaintiffs and/or to believe the statements Defendants made to Plaintiffs were true.

142.  Defendants knew these representations were material to Plaintiffs' decision to agree to become foster/adoptive parents and take placements of foster children.

143.  Plaintiffs relied upon these representations, and their reliance was justifiable.

144.  Defendants' misrepresentations caused Plaintiffs to suffer financial, emotional, and psychological harm.

## TENTH CAUSE OF ACTION
## Defamation

145.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146.  Defendants' made statements to persons other than the Plaintiffs and published statements about the Plaintiffs by making complaints and allegations about Plaintiffs available to the public.

147.  Because Defendants' the statements are written on complaint forms available to the public describing alleged deficiencies using the term, "substantiated," and written as "allegations" requiring an investigation, all of which implies improper conduct or statements by Plaintiffs, as described herein, anyone who accesses the complaints will know they are about Plaintiffs, which has injured and will continue to injure Plaintiffs and expose Plaintiffs to hatred, contempt, ridicule, shame, embarrassment, and discourages other persons and foster agencies from associating with Plaintiffs.

148.  The statements and allegations are false and Defendants purposely and knowingly failed to use reasonable care to determine the truth or falsity of the statements.

149.  Plaintiffs have suffered harm and continue to suffer harm to their professional and personal reputations caused by Defendants' false statements and allegations.

150.  Defendants' false and defamatory statements caused and continue to cause Plaintiffs to suffer financial, emotional, and psychological harm.

**ELEVENTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

151.  Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152.  Defendants' conduct was outrageous and was intended to cause Plaintiffs emotional distress, as described herein.

153.  Defendants' acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress for the actions taken by the Agency and each of the Defendants, as described herein.

154.  Defendants' actions caused Plaintiffs to be embarrassed, humiliated, and traumatized by the Defendants' actions.

//

//

155.  To retaliate against Plaintiffs for exercising their constitutional rights, Defendants knowingly and willingly encouraged a child to reject Plaintiffs as parents because they are a same-sex couple.

156.  Then, the Agency and the Defendants removed a child from Plaintiffs' home and alienated him from Plaintiffs without any rational or legal basis.

157.  Finally, Defendants investigated and then released substantiated allegations against Plaintiffs to the public on a government form citing "gay" as a "deficiency" and that the "deficiency will be corrected" so long as a gay person, "will take a … class."

158.  The Agency sanctioned violence against Plaintiffs and the deep emotional scars and humiliation Defendants inflicted on Plaintiffs will last a lifetime. To capitalize on the fear, confusion, and vulnerability of Plaintiffs, it then required them to take classes knowing the Agency had no intention of ever placing any children in Plaintiffs' home again and knowing Plaintiffs would be forever estopped from having children in their home based on Defendants' actions and conduct.

159.  Every day, Plaintiffs relive the nightmare – the child they loved and wanted to adopt is gone because an Agency steeped in policies of thwarting descent by retaliation used Plaintiffs' love for each other to prevent them from becoming a family.

160.  With defamatory and patently false statements made by the Agency and its employees in the Plaintiffs' records, all of which were made with malice and/or reckless disregard for the truth and made for the sole purpose of retaliating against Plaintiffs for exercising their constitutional rights, Plaintiffs are permanently foreclosed of any opportunities to become foster/adoptive parents or adopt through any other entity.

161.  As a result of the Agency's ongoing retaliatory and discriminatory practices, and violations of Plaintiffs' constitutional and statutory rights, Plaintiffs have and continue to suffer emotional harm and are effectively permanently barred from becoming parents and fulfilling their desire to have a family because they are gay.

//

//

//

162.   Plaintiffs were and continue to be deprived of their rights to be treated fairly, equally, and with dignity as a result of the Agency's ongoing retaliatory and discriminatory practices.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment in their favor as follows:

1.     Issue a declaratory judgment that the actions of the Defendants described herein violate the United States Constitution.

2.     Declare that the Written Directives are void for vagueness and unenforceable facially and/or as applied to Plaintiffs and foster/resource parents pursuant to the due process protections of the U.S. and California Constitutions.

3.     Issue an injunction ordering Defendants to cease engaging in unfair, unlawful, discriminatory, retaliatory, and fraudulent practices, and to develop policies and procedures and conduct staff training to prevent the recurrence of the practices.

4.     Order Defendant to pay compensatory damages to Plaintiffs pursuant to 42 U.S.C. § 1983 for the deprivation of Plaintiffs' constitutionally guaranteed rights, for statutory violations, including damages for emotional distress.

5.     Order Defendant to pay damages to Plaintiffs for pain and suffering in an amount to be proven at trial.

6.     Order Defendant to pay exemplary, punitive, compensatory, and consequential damages to Plaintiffs in an amount to be proven at trial.

7.     Award Plaintiffs reasonable attorneys' fees and costs of suit.

8.     For such other, further and different relief as the nature of this case may require or may be deemed just and proper by this Court.

//
//
//
//
//
//

## **DEMAND FOR JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38-1 of the Local Rules for the Southern District of California, Plaintiffs demand trial by jury for all the issues pleaded herein so triable.


Dated: July 26, 2019          By:    /s/ Jason H. Woltman

Jason H. Woltman

ATTORNEY FOR PLAINTIFFS